**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br>525 East Cotati Avenue<br>Cotati, CA 94931,<br><br>        Plaintiff,<br><br>  v.<br><br>THOMAS VILSACK, SECRETARY,<br>United States Department of Agriculture,<br>1400 Independence Avenue SW<br>Washington, DC 20250,<br><br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE,<br>4700 River Road<br>Riverdale, MD 20737, and<br><br><br>FOOD SAFETY AND INSPECTION<br>SERVICE,<br>United States Department of Agriculture,<br>1400 Independence Avenue SW<br>Washington, DC 20250,<br><br>        Defendants. | Case No. 21-cv-1539<br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiff Animal Legal Defense Fund brings this action to vacate and enjoin the unlawful approval of deceptive chicken and turkey labels by Defendants, the federal agency and officials charged with protecting consumers from misleading imagery and graphics on poultry product labeling.

2.      Labels convey a host of meaningful information to consumers of poultry products, from the product ingredients to myriad facts about how a bird was raised. One common way labels convey such facts is through graphics and imagery.

3.      Defendant U.S. Department of Agriculture ("USDA"), under the authority of Defendant Secretary Vilsack, is obligated to police such labeling under the Poultry Products Inspection Act ("PPIA") to prevent sellers of chicken and turkey products from duping

consumers. In recognition that label imagery and graphics can convey specific messages to consumers, the PPIA explicitly requires the USDA to ensure that "graphic matter" on poultry products—i.e., pictures, graphics, and illustrations on the label—does not convey a false impression about the products.

4.     USDA, through its subagency, Defendant Food Safety and Inspection Service ("FSIS"), reviews proposed poultry product labeling to determine compliance with regulatory requirements. FSIS must determine that labeling complies with statutory and regulatory requirements and that it is not false or misleading before approving it for use in the marketplace.

5.     Despite this mandate, FSIS does not consider any graphic matter or imagery on the poultry product labels it reviews and approves for use in the marketplace. It ignores imagery and graphics, looking exclusively at the content and placement of written statements and claims.

6.     This is a case under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenging the decision of USDA and FSIS, under the authority of Secretary Vilsack (collectively, "Defendants"), to approve the labeling of Perdue Farms' ("Perdue") Fresh Cuts and Fresh products (together, "Fresh Line") under the PPIA despite Perdue's use of misleading graphics on the Fresh Line labeling. This case challenges Defendants' consistent and categorical failure to consider graphics when reviewing and approving poultry product labels.

7.     The labels on Perdue's Fresh Line products peddle a vision of birds foraging under the sun in a pasture outside of a barn:



8.      In reality, Perdue's Fresh Line products are sourced from chickens and turkeys raised entirely indoors in warehouses, never touching a blade of grass.

9.      FSIS's decision, under the authority of the USDA and Secretary Vilsack, to ignore the PPIA's express statutory directive and turn a blind eye to Perdue's Fresh Line label imagery allows the company to mislead consumers with images that falsely represent that the chickens and turkeys sold as Perdue products were afforded access to the outdoors.

10.     But Defendants' failure is not limited to the Perdue Fresh Line labels. Their practice of ignoring graphics and imagery when approving poultry product labels allows the widespread use of misleading labeling in the marketplace in contravention of the PPIA.

11.     Defendants' actions are squarely at odds with the PPIA's plain language. Plaintiff Animal Legal Defense Fund therefore requests this Court declare unlawful and set aside FSIS's approval of Perdue's Fresh Line labels, and further enjoin Defendants from continuing to unlawfully ignore graphics in the review and approval of poultry product labels.

## JURISDICTION, VENUE, AND RELIEF

12.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 because this action constitutes a federal question under the APA, 5 U.S.C. §§ 551-801, and the Poultry Products Inspection Act, 21 U.S.C. §§ 451-72.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(e). Defendants USDA and FSIS are headquartered in the District of Columbia and a substantial part of the events or omissions giving rise to this action occurred in this district.

14.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Injunctive relief is authorized by Federal Rule of Civil Procedure 65 and the APA, 5 U.S.C. § 706.

## PARTIES

### Plaintiff

15.     Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a national animal advocacy non-profit headquartered in Cotati, California, with over 300,000 members and supporters.

16.     ALDF pursues its mission "to protect the lives and advance the interests of animals through the legal system" by advocating against cruelty to animals and for the protection of animals used in commercial enterprises, including animal agriculture. The large-scale mistreatment of animals in industrial agriculture and the lack of legal protections for these animals has led ALDF to focus significant organizational resources on educating the public about the animal cruelty and other societal ills caused by factory farming and advocating for greater legal protections for animals in agriculture.

17.     In furtherance of its mission, ALDF has long devoted organizational resources and efforts to increasing consumer awareness of the treatment of animals in industrial agriculture and to creating public pressure that leads to improvements in the welfare of farmed animals, including chickens and turkeys raised in intensive confinement operations like those used by Perdue.

18.     ALDF's advocacy and educational efforts related to transparency have taken myriad forms, including: conducting and publicizing undercover investigations of industrial farms and slaughterhouses; recruiting farm whistleblowers and challenging laws restricting or criminalizing farm whistleblowing and undercover investigations; litigating and advocating for public accessibility to government decision-making concerning factory farming; submitting public records and Freedom of Information Act requests and publicizing information related to

farmed animal raising, treatment, and slaughter; drafting and publicizing whitepapers concerning industrial farming; and conducting webinars, education events, and social media campaigns on matters related to industrial farming.

19.     One of the signature focus areas in ALDF's work to expose and reform factory farming is curbing the misleading labeling and advertising of animal products. Through a variety of advocacy channels and fora, ALDF seeks to hold accountable industry players like Perdue that use inhumane intensive confinement of animals to maximize profits while misleadingly labeling and marketing their products as humane or naturally raised. ALDF advances its organizational efforts to combat "humane-washing" and other misleading marketing of animal products through public education initiatives, media campaigns, legal resources and webinars, consumer protection litigation, and legislative and regulatory advocacy.

20.     ALDF has long engaged federal regulators—including the USDA and the Federal Trade Commission ("FTC")—to advocate for the robust enforcement of federal labeling and consumer protection laws so as to prevent "humane-washing" and "greenwashing" by animal product sellers. ALDF routinely submits comments to federal agencies concerning misleading labeling on chicken and turkey products like those at issue here.

21.     For example, in recent years ALDF commented on FSIS's "clarification" on the "free range" label claim for poultry products (*see* ALDF, Comment Letter on Revised Compliance Guideline on Documentation Needed to Substantiate Animal Raising Claims for Label Submission (Feb. 25, 2020), https://www.regulations.gov/comment/FSIS-2016-0021-13705) and on the agency's reissuance of its Animal Raising Claims labeling compliance guideline (ALDF, PETA & Compassion Over Killing, Comment Letter on FSIS's Compliance Guideline on Documentation Needed to Substantiate Animal Raising Claims for Label Submission (Dec. 5, 2017), https://www.regulations.gov/comment/FSIS-2016-0021-4559).

22.     ALDF has also commented on the USDA's approach to "natural" claims on meat and poultry product labels (ALDF & Ctr. for Biological Diversity, Comment Letter on Use of the Term "Natural" in the Labeling of Human Food Products (May 9, 2016), https://www.regulations.gov/comment/FDA-2014-N-1207-6692), petitioned for USDA and FSIS

to withhold the Official USDA mark from the labels of foie gras products (Petition No. 11-09, USDA (Sept. 1, 2011)), and petitioned the FTC and USDA to change the labeling requirements for eggs sold in the United States. *See, e.g.,* Petition No. 28, FTC (Dec. 30, 2010).

23.     In sum, ALDF has a demonstrated interest in effective regulation of poultry labeling and has long engaged in regulatory advocacy to further its organizational objectives of increasing transparency in animal agriculture so as to educate consumers and bolster reforms to cruel industrial farming methods and practices.

24.     FSIS's decision to approve Perdue's Fresh Line Label, specifically, without reviewing its graphic matter to ensure that it was not misleading frustrates ALDF's mission and impedes its work to empower consumers with truthful information about animal products. By approving Perdue's Fresh Line labels without such review, FSIS not only ignored its governing statute and regulations regarding labels, but allowed—and continues to allow—Perdue to mislead consumers about the nature of the chicken and turkey products by hiding the inhumane indoor confinement endured by the birds used in Perdue's products.

25.     As a result, ALDF has been and is compelled to spend more resources uncovering, detecting, educating the public about, and bringing to FSIS's attention the discrepancy in the graphics on Perdue's Fresh Line labels and the ongoing harms suffered by the animals Perdue raises and uses in those products. Specifically with regard to Perdue's Fresh Line, ALDF has been forced to devote organizational time and resources to: investigating the treatment of the chickens and turkeys raised for Perdue products; conducting consumer surveys and research concerning the messages the Fresh Line labels are conveying; alerting FSIS to the facts of Perdue's production methods and the results of the consumer surveys, and urging the agency to enforce the PPIA's requirements to prevent such deceptive labeling; and drafting outreach and educational pieces to alert the public to how animals are raised for Perdue's products.

26.     ALDF's campaign to end intensive confinement of animals used for food and increase transparency in the labeling of animal products is also hindered by FSIS's arbitrary and capricious and unlawful decision-making. By abdicating any responsibility to review graphic

matter on labels submitted for FSIS's review, FSIS willfully ignores ALDF's evidence of deceptive labeling in meat and poultry products. In approving Perdue's Fresh Line labels in particular, FSIS ignores the deceptive portrayal of factory farmed birds as raised on open, grassy pasture. Through this failure, FSIS acted unlawfully and limited the effectiveness of ALDF's advocacy to educate consumers about—and end—the intensive confinement of farmed chickens and turkeys.

27.    Indeed, Defendants' actions enabling Perdue and other sellers to mislead consumers about the treatment and living conditions of chickens and turkeys used for their products impede and frustrate ALDF's mission-driven activities to curtail the inhumane, large-scale confinement of these birds. For example, ALDF has devoted significant time and organizational resources to support the passage and defend the constitutionality of numerous state farmed animal confinement laws, including California's Proposition 12, the Farm Animal Confinement Initiative, which amended California's Health and Safety Code to require expanded space requirements and cage-free housing for hens used for food production. ALDF's advocacy efforts to altogether end intensive confinement of hens continued in Colorado, Hawaii, Maine, and Massachusetts, with ALDF supporting the introduction and passage of bills restricting intensive confinement of farmed animals through lobbying and educational campaigns in each state. ALDF staff also proposed and advocated for the inclusion of farmed animals, including chickens and turkeys, in Massachusetts' animal cruelty code to extend to them the protection against mistreatment afforded other animals. And ALDF devoted considerable staff time and effort to support passage of the Farm System Reform Act of 2019, S.B. 3221, 116th Cong. (2019-2021), which would place a moratorium on construction of factory farms like those Perdue sources its birds from. ALDF's legislative efforts to end the large-scale confinement of chickens and turkeys are dependent upon public awareness of, and energy to reform, the conditions these animals endure. Yet FSIS's actions here enable chicken and turkey sellers including Perdue to mislead consumers about the birds' raising environments.

28.    As a result of FSIS's unlawful decision to ignore graphic matter in reviewing and approving poultry product labeling applications, ALDF must divert resources away from other

projects to protect animals—including those to expose the abuse of animals living at other food producers' intensive confinement operations—in order to combat FSIS's misunderstanding and misapplication of the PPIA. For example, last year ALDF expended organizational resources to prepare and submit comments on FSIS's Proposed Rule Expanding Generic Label Approval, Docket No. FSIS-2019-0019 2020-17340 (Nov. 13, 2020), in order to oppose the "generic" approval of meat and poultry product labels bearing bucolic animal raising illustrations. ALDF's comments cited Perdue's Fresh Line labels in particular as an example of the need for robust regulation of such labels.

29.     If ALDF prevails here, it can stop diverting resources to address FSIS's unlawful approval of labels without any review of their graphic matter's misleading messaging. A vacatur of the agency's Perdue's Fresh Line label approval and injunction requiring lawful review of poultry product labels will remedy the use of misleading labeling in the marketplace and force the FSIS to conduct all label review, including that of Perdue's Fresh Line label, according to the express terms of the PPIA.

### Defendants

30.     THOMAS VILSACK is the Secretary of Agriculture and is responsible for administering the PPIA. Secretary Vilsack is ultimately responsible for the USDA and FSIS's decision to approve Perdue's Fresh Line label applications and for the agency's practices with respect to poultry product labeling.

31.     The UNITED STATES DEPARTMENT OF AGRICULTURE is the department responsible for administering the PPIA and ensuring that poultry products distributed to the public are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451.

32.     The FOOD SAFETY AND INSPECTION SERVICE is the subagency that reviewed and approved Perdue's application for its Fresh Line product labeling. A component of the USDA, the Food Safety and Inspection Service conducts all pre-market review of poultry product labeling under the PPIA.

## LEGAL FRAMEWORK

### The Poultry Products Inspection Act

33.     The primary purpose of the PPIA is to ensure that poultry products distributed to the public are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451.

34.     To accomplish this purpose, Congress declared its policy to "provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles . . . to prevent the movement or sale in interstate or foreign commerce of, or the burdening of such commerce by, poultry products which are adulterated or misbranded." 21 U.S.C. § 452.

35.     The PPIA prohibits the sale of false or misleading poultry products. 21 U.S.C. §§ 458(a)(2), 457(c). Under the PPIA, a product is misbranded and prohibited from sale "if its labeling is false or misleading in any particular." 21 U.S.C. § 453(h)(1).

36.     "Labeling" is defined as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 453(s).

37.     The term "label," in turn, is defined as "a display of written, printed, or *graphic matter*" upon a container. *Id*. (emphasis added).

38.     Regulations implementing the PPIA also prohibit misleading words, graphics, or marks from appearing on labeling, in whole or in part: "No product or any of its wrappers, packaging, or other containers shall bear any false or misleading marking, label, or other labeling and no statement, word, *picture*, *design*, or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling. No product shall be wholly or partly enclosed in any wrapper, packaging, or other container that is so made, formed, or filled as to be misleading." 9 C.F.R. § 317.8(a) (emphasis added); *see also* 9 C.F.R. § 381.129(b) ("No statement, word, *picture*, *design*, or device which is false or misleading in any particular or conveys any false impression

or gives any false indication of origin, identity, or quality, shall appear on any label.") (emphasis added).

39.     The PPIA is enforced by the USDA, which has empowered FSIS to review labels on poultry containers to prevent misbranded products from entering commerce. 21 U.S.C. § 452.

40.     Under the regulatory scheme, unless considered "generically approved labels," poultry product labels must be submitted to FSIS for regulatory review and approval before they can be used in the market. *See* 9 C.F.R. § 412.1. This process is referred to as "pre-market review."

41.     "Generically approved labels" are those "bear[ing] all applicable mandatory labeling features (i.e., product name, safe handling statement, ingredients statement, the name and place of business of the manufacturer, packer or distributor, net weight, legend, safe handling instructions, and nutrition labeling) in accordance with Federal regulations," which "bear claims and statements that are defined in FSIS's regulations or the Food Standards and Labeling Policy Book (except for natural and negative claims)," and which comply with federal regulations. 9 C.F.R. § 412.2(b). FSIS must still ensure such "generically approved labels" are not false or misleading in any particular, by "select[ing] samples of generically approved labels from the records maintained by" poultry product establishments "to determine compliance with label requirements." 9 C.F.R. § 412.2(a).

42.     By contrast, labels bearing "special statements and claims" are not eligible for generic approval and must be submitted for pre-market review. 9 C.F.R. § 412.1(c)(3). "'Special statements and claims'" are "claims, logos, trademarks, and other symbols on labels that are not defined in the Federal meat and poultry products inspection regulations or the Food Standards and Labeling Policy Book, (except for 'natural' and negative claims (e.g., 'gluten free')), health claims, ingredient and processing method claims (e.g., high-pressure processing), structure-function claims, claims regarding the raising of animals, organic claims, and instructional or disclaimer statements concerning pathogens (e.g., 'for cooking only' or 'not tested for E.

coli O157:H7'). Examples of logos and symbols include graphic representations of hearts and geographic landmarks." 9 C.F.R. § 412.1(e).

43.     In the pre-market review process, the poultry product establishment must submit a labeling application to FSIS that includes a sketch label. The sketch label must "clearly reflect and project the final version of the label," including "all labeling features, size, and location." 9 C.F.R. § 412.1(d).

44.     The pre-market review of sketch labels, and spot checks of generically approved labels in the marketplace, are meant to ensure that poultry product labeling is not "false or misleading in any particular," as required by the PPIA. 21 U.S.C. § 457(d). Through FSIS, USDA is tasked with ensuring that any such "misbranded" products do not enter or remain in commerce.

### The Administrative Procedure Act

45.     Courts shall "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in "excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

46.     "Agency action" includes "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13); *see also id.* § 701(2).

47.     Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

### FACTS

48.     Perdue is an industrial meat production company. It is the fourth largest poultry production company in the United States.

49.     Perdue is a vertically integrated corporation. This means Perdue controls the production of its chickens and turkeys at every stage of their short lives. Perdue controls the breeding operations, hatcheries, and grow-out operations (commonly known as confined animal

feeding operations, or "CAFOs"), as well as feed mills, slaughterhouses, and processing plants. Perdue also controls the transportation and distribution networks between these facilities.

50.     In the grow-out "broiler" houses (*i.e.*, the CAFOs that warehouse chickens raised for meat) and inside the turkey CAFOs, integrators like Perdue also control lighting duration and intensity, requiring that lighting conditions be kept according to specifications that cause the birds to grow faster in shorter amounts of time.

51.     Broiler houses require large fans for ventilation because the massive number of animals packed into the building create so much waste that the ambient ammonia levels would cause illness and death to the birds and workers without ventilation.

52.     According to Perdue's 2020 Animal Care report, as of July 2020 only half of Perdue's grow-out broiler houses had installed windows to allow in natural light.

53.     In July 2016, a *Washington Post* column noted that only 10 percent of birds raised for Perdue products had outdoor access and quoted a senior vice president at Perdue as saying, "Not every area [in the country] is appropriate for outdoor access." The situation has not improved in the past five years; in November 2019, Perdue's webpage of Frequently Asked Questions about its animal care explained that its "modern" chicken houses are "fully enclosed," and according to Perdue's 2020 Animal Care report, around 75 percent of the company's poultry houses provide no access to the outdoors.

54.     Indeed, in its 2020 Animal Care report, Perdue wrote it is increasing the number of chicken houses with "outdoor access" so as "to meet customer and consumer demand for PERDUE® HARVESTLAND® *organic and free-range chicken*," specifically (emphasis added). Thus, only a subset of the chickens and turkeys Perdue raises for slaughter and sale— and only those who are ultimately sold as "Organic and Free Range" Perdue products—have access to the outdoors, let alone the freedom to roam in open pastures.

55.     When a consumer reaches for a Perdue chicken or turkey product that is not "organic" or "free-range," that poultry product is the meat of a bird who spent his or her brief life inside a CAFO—a large, crowded warehouse—before being crammed into a cage and shipped to a slaughterhouse.

56.     Chickens and turkeys raised for the Perdue Fresh Line are neither marketed as "organic" nor as "free-range." The chickens and turkeys raised for the Perdue Fresh Line are therefore raised entirely indoors.

57.     On May 24, 2018, Perdue submitted its first sketch label application for "Whole Chicken and Chicken Parts Blanket" in its Fresh Line. The application noted that "Animal Production/Breed/Raising" is one of the "special claims [or] guarantees" on the label.

58.     Perdue included sketches of the product's labels along with the May 2018 application. The sketches included the following image:



59.     The May 2018 application included as "documentation for animal raising claims" five certificates from USDA, each certifying that Perdue had "met the requirements of the USDA Process Verified Program" at five different Perdue industrial agriculture "complexes."

60.     USDA performs and requires on-site audits of Perdue's CAFOs through the Process Verified Program. As part of the program, a USDA Agriculture and Marketing Service ("AMS") auditor must evaluate "comfort" and "shelter" at Perdue's hatcheries, grow-out facilities, and slaughterhouses.

61.     The Perdue "complexes" that USDA certified through the Process Verified Program include hatcheries, grow-out facilities, and slaughterhouses associated with slaughter and processing plants in Accomac, Virginia; Beaver Dam, Kentucky; Lewiston, North Carolina; Milford, Delaware; and Georgetown, Delaware.

62.     FSIS approved the May 2018 application on July 9, 2018, which it recorded as approval number 91102009.

63.     The approval required one minor modification to the label's text elsewhere on the package. FSIS's modification removed the word "healthy" from the sentence: "Care for animals and respect for the land go hand in hand with healthy eating." FSIS otherwise approved the 2018 Application.

64.     FSIS's approval of the May 2018 application did not require any changes to the image shown in paragraph 58, above.

65.     On November 29, 2018, Perdue submitted a nearly identical label application for its Fresh "Cuts" Line.

66.     The proposed label applied to products involving "single ingredient raw chicken parts" coming from chickens hatched, raised, and slaughtered in the same Accomac, Beaver Dam, Lewiston, Milford, and Georgetown complexes as those identified in the May 2018 application.

67.     The only difference between the May 2018 application and the November 2018 Application was "statement" text regarding how Perdue raised the chickens.

68.     The sketch of the label submitted in the November 2018 application included the same graphics displaying hens pecking for food in an outdoor pasture. The sketch is shown below:



69.     On January 17, 2019, FSIS approved the November 2018 application.

70.     FSIS did not require Perdue to make any changes to the graphic imagery on the label.

71.     The imagery on the 2018- and 2019-approved labels is misleading. Contrary to the bucolic scene of chickens on a pasture outside of a barn, surrounded by verdant plants and

sunshine, the chickens who are made into Perdue's Fresh Line of chicken products never have access to the outdoors in their short lives—let alone the freedom to roam and forage on a pasture. At least half never even experience natural light from the sun through a window.

72.    In reality, Perdue's chickens are confined in massive numbers to a large building where Perdue controls the light and temperature conditions they experience in order to most efficiently grow them into a target amount of meat.

73.    The only time the chickens who become Perdue's Fresh Line might experience direct exposure to the outdoors is on the truck that drives them from the grow-out facility to the slaughterhouse.

74.    Through its Process Verified Program, USDA was well aware the imagery on the labels was misleading when, through FSIS, it approved both the 2018 and 2019 Applications. USDA's AMS inspectors involved in certifying Perdue's Process Verified Programs at the Accomac, Beaver Dam, Lewiston, Milford, and Georgetown complexes would have observed that Perdue's conventionally raised chicken for its Fresh Line products had no access to the outdoors, let alone the ability to peck and forage in open pasture.

75.    FSIS recently explained that it "often consults with its federal partners, *e.g.*, the USDA's AMS, to decide whether the documentation submitted in support of an animal-raising claim provides the level of detail needed to ensure that the claim is truthful and not misleading." Notice of Availability of Animal Raising Guideline, 84 Fed. Reg. 71359, 71362 (Dec. 27, 2019).

76.    In briefing before the District of New Jersey federal court, Perdue explained, "FSIS has specifically advised that it even evaluates the truthfulness of the 'USDA Process Verified' claims independently from AMS." Reply in Supp. of Perdue Farms Inc.'s Mot. for J. on the Pleadings at 20, *Hemy v. Perdue Farms Inc.*, 3:11-cv-00888 (D.N.J. May 19, 2014) (Dkt. 87). To support this statement in its briefing, Perdue attached a July 11, 2011, letter in which FSIS looked to AMS's operation of the Process Verified Program to determine that "Perdue's chickens are not raised in cages." Certification of David D. Conway in Supp. of Perdue Farms

Inc.'s Reply in Further Supp. of its Mot. for J. on the Pleadings at 5, *Hemy v. Perdue Farms Inc.*, 3:11-cv-00888 (D.N.J. May 19, 2014) (Dkt. 87-1).

77.     On information and belief, Perdue submitted a "blanket" application for Fresh Line turkey products label that contained nearly identical imagery to the Fresh Line chicken products label.

78.     On information and belief, FSIS approved the label application for Perdue's Fresh Line turkey products.

79.     The following image is of the label on Perdue Fresh Line turkey products that are available in grocery stores and other retailers. Because the label, like the chicken product label, bears "special statements and claims" (such as "no hormones or steroids**"), Perdue would not have been able to market products with this label without pre-market review and approval of the label by FSIS.



**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

80.     On January 3, 2020, ALDF submitted a package of information to FSIS, explaining that label imagery like Perdue's, showing chickens and turkeys outside of a barn, under the sun, and surrounded by vegetation, for products that are not "organic" and "free range," is misleading and contrary to how the animals were raised.

81.     ALDF's package included a consumer survey of labels on three of Perdue's Fresh Line products, which ALDF commissioned from a research consultant company. The survey of 1,004 adults, which occurred October 14-16, 2019, found that 29% of respondents interpreted the chicken labels to mean that the chickens were "given access to a barnyard/pasture" and 19% of respondents interpreted the turkey label to mean the turkeys "were given access to a barnyard/pasture."

82.     In its January 2020 package, ALDF requested that FSIS "decline to approve any Perdue label applications that contain the same or similar imagery" to the Perdue Fresh Line labels depicting chickens and turkeys in a pastoral scene outside of a barn and under the sun. ALDF explained that such label approvals "would allow highly misleading product claims into the market," in violation of the PPIA.

83.     FSIS responded to ALDF's request on March 30, 2020, via letter from Rachel Edelstein, the Acting Assistant Administrator for Office of Policy and Program Development at FSIS ("Edelstein letter").

84.     The Edelstein letter rejected ALDF's request, stating that "the images [at issue] are not in violation [of] FSIS labeling requirements and can be used on product."

85.     Explaining its reasoning, the Edelstein letter stated not that FSIS had actually reviewed the images and concluded they are not misleading, but that "[t]he photos, colors, and graphics used on packaging are not considered labeling claims and do not make the product label false or misleading."

86.     FSIS therefore did not evaluate the graphic imagery Perdue submitted along with its May 2018 and November 2018 applications for label approvals for its Fresh Line chicken products. Nor does FSIS evaluate the graphic imagery that any poultry producer submits along with its application for approval of labels under the PPIA. This includes the graphics on

Perdue's Fresh Line turkey products, which, on information and belief, Perdue also submitted to FSIS for pre-market approval.

87.     Perdue Fresh Line chicken and turkey products marketed with labels containing the bucolic imagery of chickens and turkeys outside of barns, under the sun, and surrounded by green vegetation continue to be sold throughout the country.

## CLAIMS FOR RELIEF

**Claim One: Challenge to the Perdue Fresh Line Label Application Approvals**

**Violation of the Administrative Procedure Act and Poultry Products Inspection Act**

88.     Each and every allegation set forth above is incorporated herein by reference.

89.     The approvals of Perdue's May and November 2018 label applications for its Fresh Line poultry products are final agency action and subject to judicial review.

90.     The PPIA requires inspection and approval of labels prior to their sale or offer for sale in interstate commerce to ensure they are not "false or misleading in any particular." 21 U.S.C. § 457(c)-(d); 9 C.F.R. 412.1(a).

91.     Labels under the PPIA and its implementing regulations include "written, printed, or graphic matter . . . upon any article or any of its containers or wrappers." 21 U.S.C. § 453(s); *see also* 9 C.F.R. § 317.8(a). FSIS actions in reviewing labels for adherence to PPIA's requirements are performed under the authority and control of the USDA and Secretary Vilsack.

92.     FSIS's interpretation of the PPIA's definition of labeling as excluding consideration of "[t]he photos, colors, and graphics used on packaging" and finding that consequently they "do not make the product label false or misleading," is contrary to the plain-text of the statute, as well as the very purpose of the PPIA's terms.

93.     In making the 2018 and 2019 decisions to approve Perdue's Fresh Line label applications without consideration of the graphic matter or imagery on the labels, FSIS acted in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A).

94.     In making the 2018 and 2019 decisions to approve Perdue's Fresh Line label applications showing chickens in a verdant setting outside of a barn, in a field, and under the

sun, despite knowing that the Perdue products came from chickens raised entirely indoors, FSIS acted in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A). The 2018 and 2019 decisions to approve Perdue's Fresh Line labels without consideration of the labels' graphic content exceeds Defendants' statutory jurisdiction and authority and is without observance of procedure required by law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(C)-(D).

95.     Defendants' unlawful actions injure Plaintiff ALDF in the manner specified in the allegations set forth above.

**Claim Two: Challenge to Pattern and Practice of Insufficient Pre-Market Label Review**

**Violation of the Administrative Procedure Act and Poultry Products Inspection Act**

96.     Each and every allegation set forth above is incorporated herein by reference.

97.     The approvals of label applications are final agency action and subject to judicial review. FSIS's pattern and practice of routinely approving Perdue's Fresh Line label applications without consideration of the graphic matter or imagery on the labels required under the plain terms of the PPIA is arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A).

98.     FSIS's pattern and practice of routinely approving poultry product label applications without consideration of the graphic matter or imagery on the labels required under the plain terms of the PPIA is arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

99.     FSIS's pattern and practice of approving Perdue's Fresh Line label applications showing animals in natural, outdoor settings, despite knowing that the products come from animals raised entirely indoors, is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

100.     FSIS's pattern and practice of approving label applications showing animals in natural, outdoor settings, despite knowing that the products come from animals raised entirely

indoors, is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

101.   On information and belief, FSIS has not reviewed the "graphic matter [] upon any article or any of its containers or wrappers" in considering whether Perdue's Fresh Line labels submitted for pre-market review under the PPIA are false or misleading in any particular and, therefore, whether the poultry products are misbranded. 21 U.S.C. § 453(s); *see also id.* § 453(h)(1).

102.   On information and belief, FSIS does not review the "graphic matter [] upon any article or any of its containers or wrappers" in considering whether a label submitted for pre-market review under the PPIA is false or misleading in any particular and, therefore, whether the poultry product is misbranded. 21 U.S.C. § 453(s); *see also id.* § 453(h)(1).

103.   FSIS's actions in reviewing labels for adherence to PPIA's requirements are performed under the authority and control of the USDA and Secretary Vilsack.

104.   Defendants' pattern and practice of failing to consider graphic matter as part of a product's label during pre-market review exceeds Defendants' statutory jurisdiction and authority and is without observance of procedure required by law, in violation of the APA. *See* 5 U.S.C. § 706(2)(C)-(D).

105.   Defendants' pattern and practice of unlawful actions injure Plaintiff ALDF in the manner specified in the allegations set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ALDF respectfully requests that this Court:

1.   Declare that Defendants acted arbitrarily and capriciously and not in accordance with law, abused their discretion, and exceeded their statutory jurisdiction and authority when FSIS approved Perdue Farm's Fresh Line chicken and turkey product labeling without consideration of its graphic matter;

2.   Set aside as unlawful FSIS's decision, under the authority and control of the USDA and Secretary Vilsack, to approve Perdue Farm's Fresh Line labeling;

3.      Order Defendants to refrain from renewing Perdue Farm's Fresh Line labeling, unless and until Defendants determine that the label, including its graphic matter, is not misleading as that term is defined under the PPIA and its implementing regulations;

4.      Declare that Defendants acted arbitrarily and capriciously and not in accordance with law, abused their discretion, and exceeded their statutory jurisdiction and authority by categorically failing to consider graphic matter when approving poultry product labeling under the PPIA;

5.      Order Defendant FSIS to review graphic matter when evaluating poultry product label applications under and in accordance with the PPIA;

6.      Award Plaintiff ALDF its reasonable attorneys' fees and costs in this action; and

7.      Grant Plaintiff ALDF such other and further relief the Court may deem just and proper.

Dated: June 8, 2021

Respectfully submitted,

Daniel H. Waltz (D.D.C. Bar No. D00424)
Caitlin Foley (*pro hac vice* application forthcoming)
Kelsey Eberly (*pro hac vice* application forthcoming)
ANIMAL LEGAL DEFENSE FUND
525 E Cotati Ave
Cotati, CA 94931
(707) 795-2533
dwaltz@aldf.org

*Attorneys for Plaintiff Animal Legal Defense Fund*