**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ANIMAL LEGAL DEFENSE FUND,

       *Plaintiff*,

   v.

THOMAS J. VILSACK, Secretary, United
States Department of Agriculture, *et al.*,

       *Defendants*.

Civil Action No. 1:21-cv-01539 (CJN)

---

## MEMORANDUM OPINION

Under the Poultry Products Inspection Act, 21 U.S.C. §§ 451 *et seq.*, the Department of Agriculture must prevent sellers of certain poultry products from misleading customers. The Animal Legal Defense Fund asserts that the packaging of certain poultry products is misleading, and therefore claims that the Department is violating both the Inspection Act and the Administrative Procedure Act. *See generally* Am. Compl. ("Compl."), ECF No. 12. But ALDF lacks Article III standing, and the Court therefore grants the government's Motion to Dismiss. *See* Mot. to Dismiss ("Mot."), ECF No. 15, at 7–24.

### BACKGROUND

**A.  Regulatory Background**

The Poultry Products Inspection Act prohibits the sale or transportation of "misbranded" poultry products. 21 U.S.C. § 458(a)(2). The Inspection Act was enacted upon Congress's determination that "[i]t is essential . . . that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." *Id.* §451. A poultry product is "misbranded" within the meaning

1

of the Act if its label is "false or misleading."  *Id.* § 453(h).  And the term "label" includes "display[s] of written, printed, or graphic matter."  *Id.* § 453(s).

The Inspection Act gives the Department of Agriculture various tools to ensure that poultry products comply with the statutory requirements.  For example, the Department has the authority to cooperate with and review the operations of the States, conduct inspections, promulgate regulations for the operations of facilities and equipment involved in poultry products, and determine certain labeling requirements.  *Id.* §§454–57.  And relevant to this case, "[i]f the [Department] has reason to believe" that a poultry-product label "is false or misleading," the Department "may direct that such use be withheld unless the marking, labeling, or container is modified in such manner as [it] may prescribe so that it will not be false or misleading."  *Id.* § 457(d).

The Department has implemented § 457(d) by requiring all final labels to be "submitted for approval" to the Department's Food Safety and Inspection Service (FSIS).  *See* 9 C.F.R. § 412.1(a).  The submission to FSIS must include any "[s]pecial statements and claims" that will appear on the final label, such as "claims, logos, trademarks, and other symbols on labels that are not defined in the Federal meat and poultry products inspection regulations or the Food Standards and Labelling Policy Book, . . . health claims, ingredient and processing method claims[,] . . . structure-function claims, claims regarding the raising of animals, organic claims, and instructional or disclaimer statements concerning pathogens . . . ."  *Id.* § 412.1(c)(3), (e).  Only "generically approved labels" are exempt from this pre-market review requirement.  *See id.* §§ 412.1(a), 412.2. "Generically approved labels are labels that bear all applicable mandatory labeling features (i.e., product name, safe handling statement, ingredients statement, the name and place of business of

the manufacturer, packer or distributor, net weight, legend, safe handling instructions, and nutrition labeling) in accordance with Federal regulations."  *Id.* § 412.2(b).

### B.  Perdue's Fresh Line Label

Perdue is a nationwide poultry-production company.  Compl. ¶ 56.  It is vertically integrated, meaning it controls the production of chickens and turkey at every stage of their birth, growth, slaughter, and processing.  *See id.* ¶ 57.  ALDF alleges that most of these chickens and turkeys, including those raised for the Perdue Fresh Line, have little-to-no access to outside spaces during their lives.  *See id.* ¶¶ 58–64.

On May 24, 2018, Perdue submitted its first label application to FSIS for "Whole Chicken and Chicken Parts Blanket" in its Fresh Line.  *Id.* ¶ 65.  The Court includes one of the sketches included in this application below:



*Id.* at 14. FSIS approved the application on July 9, 2018. *Id.* ¶ 70. Its approval required the removal of the word "healthy" from one sentence, but otherwise demanded no other edits. *Id.* ¶ 71. FSIS did not require any changes to the picture occupying the bottom-quarter of the package. *Id.* ¶ 72. A nearly identical application for the Fresh "Cuts" Line, submitted on November 29, 2018, was approved shortly thereafter. *See id.* ¶¶ 73–78. Again, FSIS did not require any edits to the graphic imagery included on the label. *Id.* ¶ 78.

"Perdue submitted a 'blanket' application for Fresh Line turkey products label that contained nearly identical imagery to the Fresh Line chicken products label." *Id.* ¶ 85. FSIS also approved that application. *Id.* ¶ 86. The label looks something like this:



*Id.* at 19.

### C. The Animal Legal Defense Fund and Marie Mastracco

The Animal Legal Defense Fund, or "ALDF," is a nationwide animal-advocacy nonprofit based in California. *Id.* ¶ 15. It counts "over 300,000 members and supporters" among its ranks.

*Id.*  The organization's mission is "to protect the lives and advance the interests of animals through the legal system."  *Id.* ¶ 16.  It does so "by advocating against cruelty to animals and for the protection of animals in commercial enterprises, including animal agriculture."  *Id.*  Specifically, ALDF "focus[es] significant organizational resources on educating the public . . . and advocating for greater legal protections for animals in agriculture."  *Id.*; *see also id.* ¶ 17.  The organization identifies a number of ways in which it accomplishes these goals.  *See id.* ¶ 18 (listing, for example, "conducting and publicizing undercover investigations of industrial farms and slaughterhouses," as well as "conducting webinars, educational events, and social media campaigns on matters related to industrial farming").

A "signature focus area[ ]" of ALDF's work "is curbing the misleading labeling and advertising of animal products."  *Id.* ¶ 19.  ALDF explains that it achieves this goal "through public education initiatives, media campaigns, legal resources and webinars, consumer protection litigation, and legislative and regulatory advocacy."  *Id.*  "ALDF has long engaged federal regulators—including the USDA and the Federal Trade Commission—to advocate for the robust enforcement of federal labeling and consumer protection laws" to eliminate such abuses.  *Id.* ¶ 20 (parenthetical omitted).

One of ALDF's "members" is Marie Mastracco.  *See id.* ¶¶ 30–37.  For the several months preceding the filing of the Amended Complaint, Mastracco "regularly purchased Perdue's Fresh Line chicken breasts for her sick and elderly dog, Ozzie."  *Id.* ¶ 31.  She "was influenced to purchase" those products because the labels state that the chicken does not include any antibiotics. *Id.* ¶ 32.  "And seeing the graphic imagery, coupled with Perdue's use of the term 'cage free,' Ms. Mastracco interpreted the label to mean that the chickens raised for the products roamed freely on pasture, under a shining sun.  She was surprised and upset to learn that the Perdue Fresh Line

label's representation about the chickens' living environment is false, and that the birds are raised entirely indoors." *Id.*

"Because of her dog's health condition, Ms. Mastracco feels compelled to continue purchasing whole chicken breasts." *Id.* ¶ 34.  So long as the Department does not review the graphic images on the meat labels to evaluate if they are false or misleading, however, "Mastracco will continue to suffer a lack of confidence in whether *any* chicken labels convey accurate descriptions of the product's animal raising conditions." *Id.*

**D.  ALDF's Response to the Perdue Fresh Line Label**

"On January 3, 2020, ALDF submitted a package of information to FSIS, explaining that label imagery like Perdue's, showing chickens and turkeys outside of a barn, under the sun, and surrounded by vegetation . . . is misleading and contrary to how the animals were raised." *Id.* ¶ 88. Part of this package was a consumer survey of the Perdue Fresh Line labels, which ALDF commissioned. *Id.* ¶ 89.  The results of the survey showed that, of the about one thousand adults polled, 29 percent thought the chicken labels meant that the chickens were "given access to a barnyard/pasture," while 19 percent thought that the turkey label meant that the turkeys "were given access to a barnyard/pasture." *Id.*

ALDF thus requested that FSIS "decline to approve any Perdue label applications that contain the same or similar imagery." *Id.* ¶ 90.  To do otherwise, ALDF stated, "would allow highly misleading product claims into the market." *Id.*

FSIS disagreed.  *See id.* ¶¶ 91–93.  In a March 2020 letter, FSIS stated that "the images [at issue] are not in violation [of] FSIS labeling requirements and can be used on product." *Id.* ¶¶ 91–92.  This is because, FSIS explained, "[t]he photos, colors, and graphics used on the packaging are not considered labeling claims and do not make the product label false or misleading." *Id.* ¶ 93.

Thus, when in September 2020, Perdue again applied for sketch label approval of some different Fresh Line products, FSIS approved them.  *See id.* ¶¶ 95–98.  The graphics were "identical to the graphics in FSIS's 2018 and 2019 approvals."  *Id.* ¶ 95.

### E.  ALDF's Allegations

ALDF alleges here that the approval of the Perdue Fresh Line label applications violated both the Administrative Procedure Act and the Poultry Products Inspection Act.  *See id.* ¶¶ 100–08.  As ALDF puts it, "[c]ontrary to the bucolic scene of chickens on a pasture outside of a barn, surrounded by verdant plants and sunshine, the chickens who are made into Perdue's Fresh Line of chicken products never have access to the outdoors in their short lives—let alone the freedom to roam and forage on a pasture."  *Id.* at ¶ 79.  And, it alleges, the Department *knew* this imagery was misleading, since it had certified the complexes where Perdue raises its chickens.  *Id.* ¶ 82.

ALDF claims that the Department has a pattern and practice of insufficiently reviewing premarket labels, again in violation of the Administrative Procedure Act and the Inspection Act.  *See id.* ¶¶ 109–18.  And it seeks declaratory and injunctive relief.  *See id.* at 24.

As for its injury, ALDF asserts that the Department's "decision to approve Perdue's Fresh Line Label, specifically, without reviewing its graphic matter to ensure that it was not misleading[,] frustrates ALDF's mission and impedes its work to empower consumers with truthful information about animal products."  *Id.* ¶ 24.  It alleges that it "has been and is compelled to spend more resources uncovering, detecting, educating the public about, and bringing to [the Department's] attention the discrepancy in the graphics on Perdue's Fresh Line labels and the ongoing harms suffered by the animals Perdue raises and uses in those products."  *Id.* ¶ 25.  Specifically, ALDF alleges that is "has been forced to devote organizational time and resources to":

- "[I]nvestigating the treatment of the chickens and turkeys raised for Perdue products";

- "[C]onducting consumer surveys and research concerning the messages the Fresh Line labels are conveying";

- "[A]lerting FSIS to the facts of Perdue's production methods and the results of the consumer surveys, and urging the agency to enforce the [Inspection Act's] requirements to prevent such deceptive labeling"; and

- "[D]rafting outreach and educational pieces to alert the public to how animals are raised for Perdue's products."

*Id.*

ALDF further alleges that its "campaign to end intensive confinement of animals used for food and increase transparency in the labeling of animal products is also hindered by [the Department's] arbitrary and capricious and unlawful decision-making." *Id.* ¶ 26. ALDF alleges that by approving the Perdue labels in particular, the Department "ignore[d] the deceptive portrayal of factory farmed birds as raised on open, grassy pasture." *Id.* Thus, "[t]hrough this failure," ALDF alleges, the Department "acted unlawfully and limited the effectiveness of ALDF's advocacy to educate consumers about—and end—the intensive confinement of farmed chickens and turkeys." *Id.*

All of this, ALDF claims, has "impede[d] and frustrate[d] ALDF's mission-driven activities to curtail the inhumane, large-scale confinement of these birds." *Id.* ¶ 27. The organization notes that it has worked hard to pass and defend numerous statutes in various states to end the use of cramped living quarters for chickens and turkeys. *Id.* So too with a proposed bill in Congress, "which would place a moratorium on construction of factory farms like those Perdue sources its birds from." *Id.* But all these efforts, ALDF notes, "are dependent on public awareness of, and energy to reform, the conditions these animals endure." *Id.* Approving packages like Perdue's, it alleges, undermines those efforts. *Id.*

ALDF also alleges that "[a]s a result of [the Department's] unlawful decision to ignore graphic matter in reviewing and approving poultry product labeling applications, ALDF must

divert resources away from other projects to protect animals . . . in order to combat [the Department's] misunderstanding and misapplication of the [Inspection Act]." *Id.* ¶ 28.  Should it succeed here, "it can stop diverting resources to address [the Department's] unlawful approval of labels without any review of their graphic matter's misleading messaging." *Id.* ¶ 29.

## LEGAL STANDARDS

### A.  Motion to Dismiss under Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges this Court's subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), including whether the plaintiff has standing. *See, e.g.*, *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1101 (D.C. Cir. 2005).  Federal courts have limited jurisdiction.  *Gunn v. Minton*, 568 U.S. 251, 256 (2013).  And a court presumes it lacks jurisdiction "unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)). Thus, when a defendant contends that a plaintiff lacks standing, the plaintiff bears the burden of demonstrating that it does.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  When assessing such a motion, "the court assumes the truth of all material factual allegations in the complaint and construes the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged and upon such facts determines jurisdictional questions." *Kangarloo v. Pompeo*, 480 F. Supp. 3d 134, 137 (D.D.C. 2020) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)) (quotation omitted) (alterations adopted).

The government moves to dismiss all of ALDF's claims for lack of subject-matter jurisdiction.  *See* Mot. at 7–24.

### B.  Motion to Dismiss under Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss alleges a failure to state a claim.  Fed. R. Civ. P. 12(b)(6).  When assessing this type of motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)) (quotation omitted).  "[A] formulaic recitation of the elements of a cause of action," however, "will not do"; a complaint must provide more than mere labels and conclusions.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Put differently, a claim to relief must be "plausible on its face," and the pleadings must "nudge[ the] claims across the line from conceivable to plausible."  *Id.* at 570.

The government moves to dismiss only Count II of the Amended Complaint—the "pattern and practice" claim—for failure to state a claim.  *See* Mot. at 24–28.

### I. ALDF Lacks Standing

A plaintiff must demonstrate that it has Article III standing.  *See, e.g.*, *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).  That requires, of course, that the plaintiff must "show injury in fact that was caused by the conduct of the defendants and that can be redressed by judicial relief."  *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  When, as here, "the parties invoking federal jurisdiction are not 'the object of the government action or inaction' they challenge," "standing is 'substantially more difficult to establish.'"  *Id.* (quoting *Lujan*, 504 U.S. at 562).

ALDF advances two standing theories.  It argues first that it has organizational standing.  *See* Pl.'s Resp. at 4–15, ECF No. 17.  Second, and independently, it argues that it has associational standing through Mastracco.  *See id.* at 15–32.  The Court disagrees on both counts.

### A.  ALDF Lacks Organizational Standing

For an organization or association to have standing, it must show that, like an individual plaintiff, it suffered an injury in fact that was caused by the defendant and can be redressed by a favorable court decision.  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)).  The injury-in-fact requirement is perhaps the most difficult to show.  It is not enough for an organization to allege frustration of its purpose, for example; mere "frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'"  *Id.* (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir 1995)).  Rather, the Court of Appeals "has distinguished between organizations that allege that their *activities* have been impeded from those that merely allege that their *mission* has been comprised."  *Abigail All. For Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (emphases added).  Thus, in order to establish standing as an organization, ALDF "must have 'suffered a concrete and demonstrable injury to [its] activities.'"  *Food & Water Watch*, 808 F.3d at 919 (quoting *People for Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*")) (alteration in original).

To determine if ALDF has organizational standing, the Court must engage in a two-part inquiry.  *See id.*  First, the Court must ask whether the Department's action (or failure to act) injured ALDF's interests.  *Id.* (quoting *PETA*, 797 F.3d at 1094).  Second, the Court must determine whether ALDF used its resources to counteract that harm.  *Id.* (quoting *PETA*, 797 F.3d at 1094).

But lurking in the caselaw behind this seemingly straightforward test lies some nuance, particularly at the first prong.  For example, to allege an injury to its interest, an organization like

ALDF "must allege that the defendant's conduct perceptibly impaired the organization's ability to *provide services* in order to establish injury in fact." *Turlock Irrigation Dist. v. Fed. Energy Regul. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quotations omitted) (emphasis added). That would occur, for example, "when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'" *Food & Water Watch*, 808 F.3d at 919 (quoting *PETA*, 797 F.3d at 1094) (alteration in original). But "an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is *not* sufficient to give rise to an Article III injury." *Id.* (emphasis added). Similarly, "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' *unless doing so subjects the organization to* '*operational costs beyond those normally expended*.'" *Id.* at 920 (quoting *Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434) (alteration in original) (emphasis added); *accord Nat'l Taxpayers Union*, 68 F.3d at 1434 (explaining that an organization's "self-serving observation that it has expended resources to educate its members and others regarding [the contested government action] does not present an injury in fact"). All of this makes good sense: If an organization cannot provide its services because of some action—if its day-to-day operations are severely impacted—then it has suffered an injury in fact. But if an action merely goes against an organization's values—thus leading the organization to engage in investigation, litigation, or other advocacy—that is not by itself sufficient. In those circumstances, the organization itself has not been *harmed*, at least not in the sense required by Article III.

ALDF argues that the Department's actions and inaction have "perceptibly impair[ed]" its "consumer education services and other mission-driven activities." *See* Pl.'s Resp. at 5–9. As ALDF puts it, "among the core activities it engages in on a day-to-day basis are various efforts to educate consumers about the manner in which animals are raised for food, increase transparency

into the animal agriculture industry, and build public support for curbing cruel and unsustainable animal raising practices." *Id.* at 6 (citing Compl. ¶¶ 17–18).[1]  And the Amended Complaint details how ALDF reaches out to other organizations, publishes consumer resources, and hosts educational activities to further these goals.  *See* Compl. ¶¶ 18–23.  ALDF thus alleges that the Department's "failure to properly regulate poultry product labels impairs the organization's ability to provide effective consumer education and empowerment services" because "it allows companies like Perdue to mislead consumers and hide the inhumane indoor confinement the chickens and turkeys raised for the products endure."  Pl.'s Resp. at 6–7 (citing Compl. ¶¶ 23–24).  It further claims that the Department's "challenged conduct also impedes ALDF's legislative efforts aimed at ending the inhumane, large-scale confinement of birds, because such initiatives are dependent upon the public being aware of the conditions these animals suffer inside factory farms and being motivated to advocate against them."  *Id.* at 7 (citing Compl. ¶¶ 26–27).  Finally, ALDF alleges that the Department's "actions also preclude ALDF from preventing harms to animals through its regularly used process of submitting agency complaints."  *Id.* (citing Compl. ¶ 26).

These allegations fall short of establishing that ALDF's organizational interests were harmed by the Department's actions.  Take ALDF's first argument—that its ability to provide "effective consumer education and empowerment services" has been impaired because the Department "allows companies like Perdue to mislead consumers and hide the inhumane indoor

---

[1] ALDF relies on a declaration from its Chief Programs Officer.  *See* Decl. of Mark Walden, ECF No. 17-1.  "In determining standing [on a motion to dismiss], we may consider materials outside of the complaint."  *See Food & Water Watch*, 808 F.3d at 913 (citing *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003)).  But the Court finds it unnecessary to rely on the Walden declaration because it repeats the same theories of injury as the allegations in Amended Complaint and does not affect the Court's analysis.

confinement the chickens and turkeys raised for the products endure." *Id.* at 6–7 (citing Compl. ¶¶ 23–24). This is not an allegation that the Department's actions have "impaired the organization's *ability* to provide services." *Turlock Irrigation Dist.*, 786 F.3d at 24 (emphasis added). Nor is it an allegation that the Department's conduct inhibits ALDF's daily operations. *See Food & Water Watch*, 808 F.3d at 919. Rather, ALDF's day-to-day activities can continue unabated; nothing the Department has done impairs its ability to engage in the education and empowerment services themselves. Instead, this is an allegation that the Department has taken steps inconsistent with ALDF's mission—which is insufficient for Article III standing. *See id.* ("An organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1433)).

ALDF relies on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), in which an organization called HOME challenged the alleged racial steering of Havens Realty Corp., the owner of two apartment complexes in Virginia. *See id.* at 366–68. HOME's stated purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area," and it provided housing-counseling services to local residents and engaged in the investigation and referral of complaints concerning housing discrimination. *See id.* at 368. HOME alleged that "the steering practices of Havens had frustrated the organization's counseling and referral services, with a consequent drain on resources." *Id.* at 369. Conducting "the same inquiry as in the case of an individual," the Supreme Court determined that HOME had organizational standing. *Id.* at 378–79. It explained that, as alleged, "petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers," thus establishing injury in fact. *Id.* at 379. As the Court explained, "[s]uch concrete

and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

ALDF's claimed injury falls short of HOME's.  ALDF alleges that the Department's "decision to approve Perdue's Fresh Line Label . . . without reviewing its graphic matter to ensure it was not misleading frustrates ALDF's mission and impedes its work to empower consumers with truthful information about animal products."  Compl. ¶ 24.  But this is a "setback to the organization's abstract social interests," *Havens Realty Corp.*, 455 U.S. at 379, not a claim that the Department's actions perceptibly impaired *ALDF's* "ability to provide" its services, *id.*[2]

So too with ALDF's second claim of injury in fact:  that the Department's "challenged conduct also impedes ALDF's legislative efforts aimed at ending the inhumane, large-scale confinement of birds, because such initiatives are dependent upon the public being aware of the conditions these animals suffer inside factory farms and being motivated to advocate against them."  Pl.'s Resp. at 7 (citing Compl. ¶¶ 26–27).  As alleged in the Amended Complaint, the complained-of decisions "hindered" ALDF's campaigns, Compl. ¶ 26, "limited the effectiveness of ALDF's advocacy to educate consumers," *id.*, and "impede[d] and frustrate[d] ALDF's mission-driven activities," *id.* ¶ 27.  But the Court of Appeals has held that Article III standing does not exist "when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities."  *Ctr. For Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir.

---

[2] To be sure, the allegations in *Havens Realty* were far from specific.  *See Havens Realty Corp.*, 455 U.S. at 379 (block quoting the relevant portion of the complaint).  But *Havens Realty* was decided in 1982, decades before *Twombly* and *Iqbal*.  The relevant lessons to draw from *Havens Realty* thus come from the Court's discussion of an adequate injury in fact—in that case, that "petitioners' steering practices have perceptibly impaired HOME's *ability to provide* counseling and referral services for low- and moderate-income homeseekers."  *Id.* (emphasis added).

2005).  And it does not exist when, as here, the "'service' impaired is pure issue-advocacy." *Id.* at 1162.

ALDF's third alleged injury—that the Department's actions "preclude ALDF from preventing harms to animals through its regularly used process of submitting agency complaints," Pl.'s Resp. at 7 (citing Compl. ¶ 26)—is also inadequate.  ALDF does not allege that it has been prevented from complaining to the Department about Perdue's labels, only that its complaint was unsuccessful.  ALDF has not been "deni[ed] . . . access to an avenue for redress" in a way that "'perceptibly impaired [ALDF's] ability to . . . bring [regulatory] violations to the attention of the agency.'"  *See Food & Water Watch*, 808 F.3d at 920–21 (quoting *PETA*, 797 F.3d at 1095) (explaining the difference between government action that leads an organization to expend more resources educating the public, which is "an abstract injury to [an organization's] interests," and government action that foreclosed an avenue of redress or restricted the flow of information that an organization used to educate its members, which were injuries in fact).  Instead, ALDF "has alleged no more than an abstract injury to its interests," *id.* at 920, which is insufficient for Article III standing.[3]

---

[3] To the extent that ALDF seeks to argue this case is like *PETA*, the Court also disagrees.  To be sure, in *PETA*, one of the alleged harms was that PETA was precluded "from preventing cruelty to and inhumane treatment of [birds] through its normal process of submitting USDA complaints." *PETA*, 797 F.3d at 1094.  But that was because the USDA's procedural decision there "deprived PETA of key information that it relies on to educate the public." *Id.* (quotation omitted).  The Court of Appeals thus concluded that "PETA's alleged injuries—denial of access to bird-related AWA information including, in particular, investigatory information, and a means by which to seek redress for bird abuse"—were sufficient injuries. *Id.* at 1095.  In so holding, it drew parallels to *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986), a case in which the Court of Appeals found a concrete injury stemming from a restriction of information that a group used in their everyday activities. *See PETA*, 797 F.3d at 1094.  ALDF has alleged no such restriction to information here, let alone one that impacts its everyday activities.

In sum, "conflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1433).[4] That this standard is difficult for lobbying or advocacy organizations to meet, *see, e.g.*, Pl.'s Resp. at 14–15, is not an argument against the standard, but rather a recognition that lobbying organizations are rarely injured by government action in a way that imparts Article III standing.

### B. ALDF Lacks Associational Standing

An organization can also assert standing on behalf of one of its members. *See Equal Rights Ctr.*, 633 F.3d at 1138. To have associational standing, an organization must show that it has a member who would otherwise have standing to sue in his or her own right; that the interests the organization seeks to protect are germane to its purpose; and that neither the claim asserted nor the relief requested requires the participation of the individual member in the lawsuit. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The dispute here focuses on the first prong alone.

The government begins by arguing that ALDF has failed to adequately plead that it is a membership organization at all. *See* Mot. at 15–19. The Court disagrees. ALDF alleges that it is a "national animal advocacy non-profit headquartered in Cotati, California, with over 300,000 members and supporters." Compl. ¶ 15; *accord* Decl. of Mark Walden at ¶ 2. Without any

---

[4] ALDF's final argument on this point is that their allegations are "virtually identical" to those determined to be sufficient in PETA's in *People for Ethical Treatment of Animals, Inc. v. Perdue*, 464 F. Supp. 3d 300 (D.D.C. 2020)). *See* Pl.'s Resp. at 7–9. That decision is not binding on the Court, and Court of Appeals precedent requires the conclusion that ALDF lacks standing here.

countervailing evidence, the Court must treat that factual allegation, supported by the declaration of Mark Walden, as true at this stage.

In any event, as the Court of Appeals has explained, "an organization that has no members in the traditional sense may nonetheless assert associational standing" if the organization "is the functional equivalent of a traditional membership organization." *Fund Democracy, LLC v. Sec. & Exch. Comm'n*, 278 F.3d 21, 25 (D.C. Cir. 2002) (citing *Hunt*, 432 U.S. at 333, 342–45). *Hunt* had looked to three "indicia of membership": "whether the individuals played a role in selecting the organization's leadership, in guiding the organization's activities, and in financing the organization's activities." *Flyers Rights Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1361 (D.C. Cir. 2020) (citing *Hunt*, 432 U.S. at 344–45). Thus, readers of a magazine are not members of the magazine for associational-standing purposes, news watchers are not members of a media watchdog group, and individual investors who had done some past work with Fund Democracy were not members of that organization. *See id.* at 1361–62 (citing *Fund Democracy*, 278 F.3d at 25-26).

ALDF is nothing like these examples. As the government itself notes, "membership" in ALDF requires a payment, which at least helps finance the organization's activities. *See* Mot. at 19 n.4; *see also* Pl.'s Resp. at 16 (ALDF's membership consists of individuals . . . who have donated within the past five years."; *id.* at 17 (Individual member financial contributions annually account for around 80 percent of ALDF's income stream."). Additionally, ALDF's members "play a role in driving organizational activities and policies" through its National Leadership Counsel, solicitation of membership input, and participating in ALDF's activities of submitting complaints and signing petitions. *See* Pl.'s Resp. at 17 (quoting Walden Decl. at ¶¶26-27). The Court finds these allegations sufficient to establish this threshold requirement of associational standing.

The government's second argument focuses on whether Mastracco has standing.  ALDF must, of course, allege sufficient facts to show that Mastracco herself suffered an injury in fact, that there is a causal connection between the injury and the conduct complained of, and that it is likely—not merely speculative—that the injury could be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560–61; *see also The Wilderness Soc'y v. Norton*, 434 F.3d 584, 589 (D.C. Cir. 2006) ("In order to establish standing, [an organization] must demonstrate, as to each of its claims, that at least one member meets the requirements of *Lujan*.").  It has failed to do so.

To recap the Amended Complaint, ALDF alleges that Mastracco has regularly purchased Perdue's Fresh Line chicken breasts for the last several months to feed "her sick and elderly dog, Ozzie."  Compl. ¶ 31.  "In deciding which chicken breasts to purchase, Ms. Mastracco considered factors such as whether the chickens raised for the meat were healthy, given any chemical hormones, and treated humanely.  She relied on the products' labels to provide information about these factors."  *Id.*  But what ultimately led her to purchase these particular chicken breasts was her concern about antibiotics.  On this, the Amended Complaint could not be clearer:  "Ms. Mastracco was influenced to purchase Perdue's Fresh Line chicken products by label claims about no antibiotics."  *Id.* ¶ 32.

To be sure, ALDF does allege that Mastracco considered the imagery on the package.  "[S]eeing the graphic imagery, coupled with Perdue's use of the term 'cage free,'" ALDF alleges, "Ms. Mastracco interpreted the label to mean that the chickens raised for the products roamed freely on pasture, under a shining sun."  *Id.*  She was not pleased to learn this georgic scene had no basis in reality:  "She was surprised and upset to learn that the Perdue Fresh Line's label's representations about the chickens' living environment is false, and that the birds are raised entirely indoors."  *Id.*  Despite this newfound knowledge, though, Mastracco still "feels compelled to

continue purchasing whole chicken breasts." *Id.* ¶ 34.  She thus "continue[s] to suffer a lack of confidence in whether *any* chicken labels convey accurate descriptions of the product's animal raising conditions." *Id.* (emphasis in original).  ALDF also alleges that the Department's "unlawful approvals of Perdue's Fresh Line labels caused Ms. Mastracco's consumer harm." *Id.* ¶ 33.

ALDF has failed to allege sufficient facts showing that Mastracco is suffering an injury in fact.  "A concrete injury is direct, real, and palpable—not abstract." *Food & Water Watch, Inc.*, 808 F.3d at 914 (quotations omitted).  Mere disappointment that a cartoon depiction of chickens in the field does not match reality, without more, is insufficient. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist.").  This might, perhaps, be a different case if purchasing free-roaming chicken was Mastracco's aim— if that was the factor that drew her to purchase Perdue's Fresh Line products in the first place— and she was now paralyzed from purchasing future poultry products through lack of faith in the accuracy of their labels.  But that is not this case.  "Ms. Mastracco was influenced to purchase Perdue's Fresh Line chicken products by label claims about no antibiotics." Compl. ¶ 32.

Nor is it enough to allege that Mastracco has continued (and presumably will continue) to purchase Perdue Fresh Line chicken.  As the Amended Complaint makes clear, Mastracco has been disabused altogether of any notion that the cartoon chickens represent reality. *See id.* (Mastracco "learn[ed] that the Perdue Fresh Line label's representation about the chickens' living environment is false, and that the birds are raised entirely indoors").  She thus cannot rely on that imagery—and be harmed by such reliance—since she is now equipped with this knowledge. *Cf. Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.  Such harm does not amount to an 'injury' cognizable under Article III.").  Since she

20

never relied on the label's imagery to make her purchasing decision in the first place, she certainly cannot be harmed by relying on it in the future, given the knowledge she now has.

ALDF does allege that Mastracco now lacks confidence in the accuracy of *all* chicken labels. And "concrete" is not necessarily synonymous with "tangible," as the Supreme Court has explained, which gives some background appeal to this observation. *Spokeo*, 136 S. Ct. at 1549. But none of the allegations suffices to show a concrete harm to Mastracco. As the Eleventh Circuit has recently explained, "while a concrete injury needn't necessarily be 'tangible,' the Court has consistently held that purely psychic injuries arising from disagreement with government action— for example 'conscientious objection' and 'fear'—do not qualify." *Gardner v. Mutz*, 962 F.3d 1329, 1341 (11th Cir. 2020) (citations omitted). Equipped with the knowledge of how the Department allegedly reviews and approves poultry labels, and disagreeing with how it is done, is that kind of injury.

ALDF primarily relies on two cases to argue to the contrary: *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018) and *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181 (D.D.C. 2013). *See* Pl.'s Resp. at 22–32.

*Davidson*, of course, is not binding here. In any event, and whether or not it correctly interprets Article III's demands, its holding is inapplicable. *Davidson* held that a consumer had standing because she "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to"; and "she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." *Davidson*, 889 F.3d at 969–

70.  Here, in contrast, ALDF alleges that Mastracco *will* likely purchase chicken in the future, and does *not* allege that that she will do so under the assumption that the product has improved.[5]

As for *Richardson*, which is also not binding, that decision dealt with a proposed class-action settlement regarding the allegedly misleading nature of certain L'Oréal products, which said "salon-only" although they were not only sold in salons.  *Richardson*, 991 F. Supp. 2d at 187–188.  The court "conclude[d] that plaintiffs have standing despite their knowledge of the 'salon-only' misrepresentation because of the likelihood of future harm," as even consumers with such knowledge "will be harmed—without an injunction—by not being able to rely on the 'salon-only' label with any confidence."  *Id.* at 194.  Again, this case is distinguishable.  Unlike in *Richardson*, where the "salon-only" label had "deceived and misled" the plaintiffs, *see id.* at 191 (quotation omitted), Mastracco was never misled in the first place.  Not once did she purchase the poultry products at issue because she relied on the cartoon chickens or turkeys on the package.  And now that she knows they are not accurate, she will not rely on them going forward.

\*      \*      \*

Access to federal courts is limited to parties who were actually injured by the challenged government action.  Neither ALDF nor Mastracco have shown that to be the case.  The Court will thus grant the government's Motion to Dismiss the Amended Complaint, ECF No. 15, and deny as moot the government's original Motion to Dismiss the Complaint, ECF No. 10.  And because

---

[5] *Davidson* also acknowledged that the question of standing was "a close question." *Davidson*, 889 F.3d at 971.  And subsequent Ninth Circuit decisions have treated *Davidson's* categories as essentially exclusive. *See, e.g.*, *In re Coca-Cola Prod. Mktg. & Sales Practice Litig.*, No. 20-15742, 2021 WL 3878654, at \*2 (9th Cir. Aug. 31, 2021) ("None of the plaintiffs in this case allege a desire to purchase Coke *as advertised*, that is, free from what they believe to be artificial flavors or preservatives, nor do they allege in any other fashion a concrete, imminent injury. . . . Under governing law, such an abstract interest in compliance with labeling requirements is insufficient, standing alone, to establish Article III standing.").

ALDF lacks standing, the Court need not address the argument that Count II of the Amended

Complaint fails to state a claim.  An appropriate Order will follow.


DATE:  November 14, 2022

CARL J. NICHOLS
United States District Judge